## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : : : : : |
| **Plaintiff,** | : : **Civil Action File No.** |
| **v.** | : : **2:17-cv-432** |
| **HADSELL CHEMICAL PROCESSING, LLC and ROBERT WALTON, JR.** | : : : |
| **Defendants.** | : : |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges as follows:

## NATURE OF THE ACTION

1.      The Commission brings this action based on a fraudulent and unregistered offering of securities by Hadsell Chemical Processing, LLC ("HCP") and its president, Robert Walton, Jr., ("Walton"). From April 2012 through October 2015, HCP and Walton raised approximately $12 million through the offer and sale of promissory notes to 65 investors in at least five states.

2.      Walton and HCP misrepresented to the investors that the promissory notes were signed and guaranteed by a wealthy local businessman, Don Hadsell ("Hadsell"). In reality, Walton forged Hadsell's signature on the notes and did not obtain his guarantee. To bolster the false guarantee, Walton provided certain investors with a fake copy of Hadsell's personal financial statement on which he had forged Hadsell signature, without Hadsell's knowledge or approval.

3. Walton and HCP also misrepresented to investors that HCP had received multi-million dollar contracts for chemical processing and was profitable, when, in reality, the contracts did not exist and HCP was operating at a loss. To bolster these misrepresentations, Walton provided investors with copies of fake purchase orders he had created and false HCP financial statements that reported a profit instead of a loss.

4. HCP has spent all or most of the money it raised from investors. The promissory notes are not listed on any exchange and cannot be sold to the public. As a result, HCP's investors have suffered and are likely to continue suffering a significant loss on their investments.

## VIOLATIONS

5. By engaging in the conduct alleged in this Complaint, Walton and HCP have violated the following provisions of the federal securities laws: Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. § 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. § 78u and 78aa]. Defendants Walton and HCP, directly and indirectly, have made use of the means or instrumentalities of interstate commerce and of the mails, in connection with the acts, practices, and courses of business alleged in this Complaint.

7. Venue is proper in the Southern District of Ohio pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because some of the acts, practices and courses of business alleged in this

Complaint took place within this district and, during the period of the conduct, Walton and HCP resided and transacted business within the district.

## DEFENDANTS

8.      Robert Walton, Jr., age 48, resides in Loveland, Ohio.  He was HCP's president and majority owner from 2011 until approximately October 2015, when he was removed from his position and relinquished his ownership interest in HCP.

9.      HCP is an Ohio limited liability company located in Waverly, Ohio.  It commenced operations in late 2011 to provide chemical processing and packaging services for other businesses. HCP is now owned and managed by Hadsell. HCP has never had a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act.

## FACTS

### Walton Controlled the Business Operations of HCP

10.      Walton and Hadsell formed HCP in late 2011 as a tolling, mixing, processing and packaging business for chemical companies.

11.      Hadsell provided Walton with seed money and the use of a building he owned in which to operate HCP. Hadsell was not involved in the operations of HCP, though he was a minority owner of the company during the course of the misconduct.

12.      As HCP's president, Walton controlled the operations of HCP and its bank accounts, hired its employees, and made all decisions concerning the investments it offered to investors.

13.      In 2013, HCP, through Walton, began operating Relevant Compounding, another start-up business that created topical ointments containing pharmaceuticals.

3

14.    In 2015, HCP, through Walton, invested in a business called COPI, which was to produce and sell topical ointments containing cannabis in Colorado.

**HCP and Walton Sold Promissory Notes to Investors Without Registration**

15.    From approximately April 2012 through October 2015, HCP and Walton raised approximately $12 million for HCP through the offer and sale of promissory notes and represented that the money would be used for HCP's business operations.

16.    HCP and Walton offered and sold HCP's promissory notes by email, telephone, and in-person meetings to 65 investors in at least five states.

17.    Between 2012 and late 2014, the promissory notes had annualized interest rates from 10% to 15% and maturities that typically extended beyond one year.

18.    During 2015, HCP and Walton began selling new HCP promissory notes that promised repayment of principle plus 15% annualized interest with four-year maturities. HCP and Walton also rolled outstanding notes into these new four-year notes.

19.    No registration statement was in effect or filed with the Commission in connection with these promissory notes.

20.    Walton, as HCP's president, led the capital raising efforts and was involved in every aspect of the promissory note offerings. He decided the terms of the promissory notes and the total amount of the offerings. He hosted the meetings with investors and provided them with information about the offerings. He also answered investors' questions by telephone and email.

21.    While offering and selling the promissory notes, Walton and HCP failed to provide any of the investors with disclosure documents similar to those used in registered offerings, such as an offering memorandum and audited financial statements.

22.     Walton and HCP also sold the promissory notes to investors without inquiring or obtaining information as to whether they qualified as accredited investors.

**HCP and Walton Made Misrepresentations to Investors**

23.     Walton told investors orally and in emails that their investments were guaranteed by Hadsell, personally. This guarantee signified that investors would be repaid through his significant net worth and they would not have invested without the guarantee.

24.     Walton, however, did not inform Hadsell that he was raising money for HCP by issuing promissory notes or obtain Hadsell's personal guarantee. He also forged Hadsell's signature on the notes.

25.     From at least October 2014 through August 2015, Walton also provided both potential and new investors with a purported personal financial statement reflecting that Hadsell had a significant net worth as of March 20, 2014 in order to demonstrate that Hadsell had sufficient funds with which to guarantee the investments.

26.     However, Walton prepared the personal financial statement, forged Hadsell's signature on it, and provided it to investors without Hadsell's knowledge or approval.

27.      In response to a question from a potential investor in November 2014, Walton forged Hadsell's signature on a separate letter purportedly confirming that the net worth listed in Hadsell's personal financial statement was unchanged as of November 5, 2014, and provided the letter to several investors.

28.     In March 2015, Walton changed the date on Hadsell's personal financial statement to March 20, 2015, and provided it to later investors.

29.     From November 2014 through at least August 2015, Walton also represented to potential and new investors that HCP had received millions of dollars of purported customer contracts with three companies – Company A, Company B, and Company C.

30.     To bolster his claim, Walton created fake purchase orders purportedly issued by Company A to HCP and provided them to certain of the investors. In the fake purchase orders, Walton claimed that Company A had awarded three contracts to HCP for a total of over $7 million in chemical processing revenue that would be earned in 2015.  Walton offered certain investors a percentage of the revenue from one of the fake Company A contracts as another possible return on their investments.

31.     In reality, Company A had had not entered into any contract with HCP until September and October 2015, when it provided two small purchase orders for a total of $5,600, not $7 million.

32.     Walton represented to investors orally and by email that HCP had entered into a chemical processing contract with Company B that would produce $3.45 million of income in 2015 and emailed them a fake purchase order for $1.48 million. Walton told investors that the contract with Company B was producing $80,000 in profits per month and with the purchase of another piece of equipment, HCP could increase the profit to a maximum of $200,000 per month by the end of 2015.

33.     In reality, Walton received purchase orders from Company B for a total of approximately $110,000 in January and February 2015, which was contingent upon approval of the quality of HCP's work by Company B's customers.

34.     In January 2015, Walton told investors that Company C had offered HCP a chemical processing contract for 40 tons per year, with revenues ranging from $16 million to $18 million per year. In reality, HCP was not offered that contract and did little work for Company C.

35.     From January 2013 through at least August 2015, Walton told investors orally and by email that HCP and its related business, Relevant Compounding, were profitable, when both businesses actually incurred net losses.

36.     From July 2014 through at least August 2015, Walton provided investors profit and loss statements for both HCP and Relevant Compounding that contained false information.

37.     As demonstrated in the following chart, Walton misled investors by fraudulently overstating the income (i.e., revenue) and net income (i.e., profit) on the profit and loss statements before providing them to investors:

| Date | Description | Actual Total Income | Overstated Total Income | Actual Net Income or Loss | Overstated Net Income |
|------|-------------|---------------------|-------------------------|---------------------------|-----------------------|
| 7/7/14 | HCP P&L Jan-June 2014 | $939,449.38 | *$1,006,744.88* | ($241,610.63) | *$394,659.63* |
| 8/26/14 | RC P&L Jan-July 2014 | $733,459.69 | *$968,922.89* | ($171,192.10) | *$64,271.10* |
| 1/6/15 | RC P&L Jan-Dec 2014 | $1,334,540.65 | *$2,399,790.83* | ($394,919.53) | *$1,410,290.39* |
| 1/15/15 | HCP P&L Jan-Dec 2014 | $1,156,696.51 | *$4,390,783.24* | ($2,164,892.98) | *$2,886.97* |
| 5/23/15 | HCP P&L Jan-Apr 2015 | $25,673.55 | *$1,660,275.85* | ($661,645.87) | *$709,569.08* |
| 5/17/15 | RC P&L Jan-Mar 2015 | $286,627.64 | *$690,360.04* | $37,843.59 | *$304,409.93* |
| 8/22/15 | HCP P&L Jan-Jun 2015 | $252,709.16 | *$2,323,434.55* | ($1,964,879.82) | *$596,177.11* |
| 8/21/15 | RC P&L Jan-Jun 2015 | $782,572.71 | *$1,219,004.00* | $198,533.14 | *$396,298.76* |

38.     From January 2015 through at least August 2015, Walton told investors that some of their money would be used to invest in COPI, a new business that was supposed to start selling topical ointments containing cannabis in Colorado later that year. During this period, Walton travelled to Colorado with prospective investors to meet with representatives of COPI.

39.     Walton represented to investors orally and by email that by the end of June 2015, HCP planned to provide $1.2 million from the sale of HCP promissory notes to COPI in exchange for a 43% ownership in COPI.

40.     In reality, Walton only provided approximately $300,000 to COPI in 2015, and used the additional money he raised from the sale of HCP promissory notes for other business expenses. Consequently, HCP did not receive any ownership interest in COPI.

**HCP Removed Walton after Learning of the Securities Fraud**

41.     HCP made interest and principle payments to some investors but stopped making payments in approximately August 2015.

42.     In September 2015, several investors contacted Hadsell about their difficulties seeking interest payments on their HCP promissory notes. At that time, Hadsell learned that Walton had forged his signature on the promissory notes and had told investors that Hadsell had guaranteed the notes. After Hadsell confronted Walton about this information, Walton admitted to forging Hadsell's signature on the promissory notes.

43.     In December 2015, Hadsell removed Walton from his role as president of HCP and Walton agreed to relinquish his ownership interest in the company.

44.     Walton received at least $588,000 from HCP for compensation, benefits, and expenses between April 1, 2012 and December 31, 2015.

45.     As of May 1, 2017, HCP still owes approximately $8.1 million in un-repaid offering proceeds (principal) to investors.

## COUNT I

**Violations of Section 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act**

46.     The Commission realleges and incorporates by reference paragraphs 1 through 45.

47.     At all relevant times, Walton, as the President of HCP, controlled HCP and its bank accounts.  Walton reviewed, approved and had ultimate authority over the written and oral information provided to investors in the offer or sale of promissory notes for HCP.

48.     Walton and HCP, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce and by use of the mails, directly or indirectly, employed devices, schemes and artifices to defraud.

49.     Walton and HCP, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes, or artifices to defraud; or obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

50.     Walton and HCP acted knowingly, with a reckless disregard for the truth, and/or negligently in engaging in the fraudulent conduct described above.

51.     By engaging in the conduct described above, Walton and HCP have violated, and unless restrained and enjoined, will continue to violate, Sections 17(a)(1),

17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2) and 77q(a)(3)].

## COUNT II

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5(a), (b) and (c)

52.    The Commission realleges and incorporates by reference paragraphs 1 through 45.

53.    At all relevant times, Walton, as the President of HCP, controlled HCP and its bank accounts.  Walton reviewed, approved and had ultimate authority over the written and oral information provided to investors in connection with the sale of HCP promissory notes.

54.    Walton and HCP,  in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly: (a) used or employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

55.    Walton and HCP knowingly or recklessly engaged in the fraudulent conduct described above.

56.    By engaging in the conduct described above, Walton and HCP have violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

## COUNT III

**Violations of Sections 5(a) and 5(c) of the Securities Act**

57.     The Commission realleges and incorporates by reference paragraphs 1 through 45.

58.     The promissory notes that Walton and HCP offered to sell and sold to the investing public were "securities" as defined by Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10)) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

59.     No registration statement was filed or in effect with the Commission and no exemption from registration existed with respect to the HCP securities and transactions described in this Complaint.

60.     As described above, Walton and HCP have, directly or indirectly:

a.   made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect;

b.   for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; or

c.   made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed.

61. By engaging in the conduct described above, Walton and HCP have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court enter a final judgment against the Defendants and:

## I.

Permanently enjoin Defendants Walton and HCP from, directly or indirectly, violating Sections 5(a), 5(c), 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(2), and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

## II.

Order Defendants Walton and HCP each to disgorge all ill-gotten gains received as a result of the violations alleged in this Complaint, plus prejudgment interest. This relief shall be applicable to Defendant HCP to the extent the automatic stay triggered by its Chapter 7 proceeding, *In re Hadsell Chemical Processing, LLC,* No. 17-52717 (Bankr. S.D. Ohio) is no longer in effect or has been determined with finality not to apply. Nothing in this Complaint shall be construed as an act of collection by the Commission against Defendant HCP.

## III.

Order Defendant Walton to pay civil penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21 of the Exchange Act [15 U.S.C. § 78u].

## IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all

orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the Court's jurisdiction.

**V.**

Grant such other relief as the Court deems necessary and appropriate.


Dated: May 17, 2017                     Respectfully submitted,

                                        /s/ James A. Davidson_____
                                        James A. Davidson
                                        davidsonj@sec.gov
                                        Anne C. McKinley
                                        mckinleya@sec.gov
                                        John E. Birkenheier
                                        birkenheierj@sec.gov

                                        Attorneys for Plaintiff
                                        U.S. Securities and Exchange Commission
                                        Chicago Regional Office
                                        175 West Jackson Blvd., Suite 1450
                                        Chicago, Illinois 60604
                                        (312) 353-7390
                                        (312) 353-7398 (fax)